# UNITED STATES DISTRICT COURT

## District of Kansas

### (Kansas City Docket)

UNITED STATES OF AMERICA,

       Plaintiff,

      v.                  CASE NO.  <u>17-20033-JAR</u>

STEVEN D. LAVY,

       Defendant.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE
### (Doc. 57)

APPEAR NOW the United States of America, by and through Jared S. Maag, Assistant United States Attorney, and respectfully submit the following in response to the defendant's emergency motion for compassionate release:

The defendant moves this Court for an immediate order of compassionate release on grounds that COVID-19 presents a serious risk to his overall health, which (as he maintains) is particularly compromised by his hypertension.

1

(Doc. 57, Mot. for Compassionate Release at 2.)   The United States respectfully opposes the motion.   This Court should deny the motion on grounds that the defendant has not met his burden of establishing that a sentence reduction is warranted under the statute.

## I.   PROCEDURAL HISTORY

On July 6, 2017, a grand jury sitting in Kansas City, Kansas issued a one count indictment charging the defendant with bank robbery, in violation of 18 U.S.C. § 2113.   (Doc. 9, Indt. at 1-3.)

On January 22, 2019, the defendant entered a guilty plea, without an agreement, to the sole count in the indictment.   (Doc. 43, Plea Pet. at 1-7.)

On October 10, 2019, the defendant was sentenced to a controlling term of 48 months' imprisonment.   (Doc. 54, Judgment at 2.)   The defendant is presently set to be released from the Bureau of Prisons on November 17, 2020.

## II.   ARGUMENT

### A.   BOP's Response to the COVID-19 Pandemic

As this Court is well aware, COVID-19 is an extremely dangerous illness that has caused many deaths in the United States in a short period of time and that has resulted in massive disruption to our society and economy.   In response

to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge.

BOP has explained that "maintaining safety and security of [BOP] institutions is [BOP's] highest priority." BOP, Updates to BOP COVID-19 Action Plan: Inmate Movement (Mar. 19, 2020), available at https://www.bop.gov/resources/news/20200319_covid19_update.jsp.

Indeed, BOP has had a Pandemic Influenza Plan in place since 2012. BOP Health Services Division, Pandemic Influenza Plan-Module 1: Surveillance and Infection Control (Oct. 2012), available at https://www.bop.gov/resources/pdfs/pan_flu_module_1.pdf. That protocol is lengthy and detailed, establishing a six-phase framework requiring BOP facilities to begin preparations when there is first a "[s]uspected human outbreak overseas." *Id*. at i. The plan addresses social distancing, hygienic and cleaning protocols, and the quarantining and treatment of symptomatic inmates.

Consistent with that plan, BOP began planning for potential coronavirus transmissions in January. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control, including by reviewing guidance from the World Health Organization.

3

On March 13, 2020, BOP began to modify its operations, in accordance with its Coronavirus (COVID-19) Action Plan ("Action Plan"), to minimize the risk of COVID-19 transmission into and inside its facilities.   Since that time, as events require, BOP has repeatedly revised the Action Plan to address the crisis.

Beginning April 1, 2020, BOP implemented Phase Five of the Action Plan, which currently governs operations.   The current modified operations plan requires that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease.   Only limited group gathering is afforded, with attention to social distancing to the extent possible, to facilitate commissary, laundry, showers, telephone, and computer access.   Further, BOP has severely limited the movement of inmates and detainees among its facilities.   Though there will be exceptions for medical treatment and similar exigencies, this step as well will limit transmissions of the disease.   Likewise, all official staff travel has been cancelled, as has most staff training.

All staff and inmates have been and will continue to be issued face masks and are strongly encouraged to wear an appropriate face covering when in public areas when social distancing cannot be achieved.

Every newly admitted inmate is screened for COVID-19 exposure risk factors and symptoms.   Asymptomatic inmates with risk of exposure are placed in quarantine for a minimum of 14 days or until cleared by medical staff. Symptomatic inmates are placed in isolation until they test negative for COVID-19 or are cleared by medical staff as meeting CDC criteria for release from isolation.   In addition, in areas with sustained community transmission, such as Philadelphia, all facility staff are screened for symptoms.   Staff registering a temperature of 100.4 degrees Fahrenheit or higher are barred from the facility on that basis alone.   A staff member with a stuffy or runny nose can be placed on leave by a medical officer.

Contractor access to BOP facilities is restricted to only those performing essential services (e.g. medical or mental health care, religious, etc.) or those who perform necessary maintenance on essential systems.   All volunteer visits are suspended absent authorization by the Deputy Director of BOP.   Any contractor or volunteer who requires access will be screened for symptoms and risk factors.

Social and legal visits were stopped as of March 13, and remain suspended until at least May 18, 2020, to limit the number of people entering the facility and interacting with inmates.   In order to ensure that familial relationships are

maintained throughout this disruption, BOP has increased detainees' telephone allowance to 500 minutes per month.   Tours of facilities are also suspended. Legal visits will be permitted on a case-by-case basis after the attorney has been screened for infection in accordance with the screening protocols for prison staff.

Further details and updates of BOP's modified operations are available to the public on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

In addition, in an effort to relieve the strain on BOP facilities and assist inmates who are most vulnerable to the disease and pose the least threat to the community, BOP is exercising greater authority to designate inmates for home confinement.   On March 26, 2020, the Attorney General directed the Director of the Bureau of Prisons, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement.   That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, *see* 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g).   Congress has also acted to enhance BOP's flexibility to respond to the pandemic.   Under the Coronavirus Aid, Relief, and Economic Security Act,

enacted on March 27, 2020, BOP may "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement" if the Attorney General finds that emergency conditions will materially affect the functioning of BOP.   Pub. L. No. 116-136, § 12003(b)(2), 134 Stat. 281, 516 (to be codified at 18 U.S.C. § 3621 note).   On April 3, 2020, the Attorney General gave the Director of BOP the authority to exercise this discretion, beginning at the facilities that thus far have seen the greatest incidence of coronavirus transmission.

Taken together, all of these measures are designed to mitigate sharply the risks of COVID-19 transmission in a BOP institution.   BOP has pledged to continue monitoring the pandemic and to adjust its practices as necessary to maintain the safety of prison staff and inmates while also fulfilling its mandate of incarcerating all persons sentenced or detained based on judicial orders.

Unfortunately and inevitably, some inmates have become ill, and more likely will in the weeks ahead.   But BOP must consider its concern for the health of its inmates and staff alongside other critical considerations.   For example, notwithstanding the current pandemic crisis, BOP must carry out its charge to incarcerate sentenced criminals to protect the public.   It must consider the effect of a mass release on the safety and health of both the inmate population and the

7

citizenry.   It must marshal its resources to care for inmates in the most efficient and beneficial manner possible.   It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of both transportation for inmates (at a time that interstate transportation services often used by released inmates are providing reduced service), and supervision of inmates once released (at a time that the Probation Office has necessarily cut back on home visits and supervision).[1]

### B.   Legal Framework

Under 18 U.S.C. § 3582(c)(1)(A), this Court may, in certain circumstances, grant a defendant's motion to reduce his term of imprisonment.   Before filing that motion, however, the defendant must first request that BOP file such a motion on his behalf pursuant to Section 3582(c)(1)(A).   A court may grant the defendant's own motion for a reduction in his sentence only if the motion was filed "after the defendant has fully exhausted all administrative rights to appeal

---

[1] On Monday, May 18, 2020, the Director of the Bureau of Prisons (BOP) ordered the implementation of Phase 7 of its COVID-19 Action Plan. This phase extends all measures from Phase 6, to include measures to contain movement and decrease the spread of the virus. The Phase 7 Action Plan will remain in place through June 30, 2020, at which time the plan will be evaluated. The BOP will continue to provide daily updates and information related to COVID-19 at www.bop.gov/coronavirus/index.jsp; additional information about the agency can be found at www.bop.gov.

a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or after 30 days have passed "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."   *Id.*

If that exhaustion requirement is met, as it appears to have been here, (Doc. 57-1), a court may reduce the defendant's term of imprisonment "after considering the factors set forth in [18 U.S.C. § 3553(a)]" if the Court finds, as relevant here, that (i) "extraordinary and compelling reasons warrant such a reduction" and (ii) "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." § 3582(c)(1)(A)(i).   As the movant, the defendant bears the burden to establish that he is eligible for a sentence reduction.   *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016); *United States v. Green*, 764 F.3d 1352, 1356 (11th Cir. 2014).

The Sentencing Commission has issued a policy statement addressing reduction of sentences under Section 3582(c)(1)(A).   As relevant here, the policy statement provides that a court may reduce the term of imprisonment after considering the Section 3553(a) factors if the Court finds that (i) "extraordinary and compelling reasons warrant the reduction;" (ii) "the defendant is not a danger to the safety of any other person or to the community,

9

as provided in 18 U.S.C. § 3142(g);" and (iii) "the reduction is consistent with this policy statement."   U.S.S.G. § 1B1.13.[2]

The policy statement includes an application note that specifies the types of medical conditions that qualify as "extraordinary and compelling reasons." First, that standard is met if the defendant is "suffering from a terminal illness," such as "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, [or] advanced dementia." U.S.S.G. § 1B1.13, cmt. n.1(A)(i).   Second, the standard is met if the defendant is:

> (I) suffering from a serious physical or medical condition,
>
> (II) suffering from a serious functional or cognitive impairment, or
>
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
>> that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

---

[2] The policy statement refers only to motions filed by the BOP Director. That is because the policy statement was last amended on November 1, 2018, and until the enactment of the First Step Act on December 21, 2018, defendants were not entitled to file motions under Section 3582(c). *See* First Step Act of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat. 5194, 5239; *cf.* 18 U.S.C. § 3582(c) (2012). In light of the statutory command that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," § 3582(c)(1)(A)(ii), and the lack of any plausible reason to treat motions filed by defendants differently from motions filed by BOP, the government submits that the policy statement applies to motions filed by defendants as well.

U.S.S.G. § 1B1.13, cmt. n.1(A)(ii).   The application note also sets out other conditions and characteristics that qualify as "extraordinary and compelling reasons" related to the defendant's age and family circumstances.   U.S.S.G. § 1B1.13, cmt. n.1(B)-(C).   Finally, the note recognizes the possibility that BOP could identify other grounds that amount to "extraordinary and compelling reasons."   U.S.S.G. § 1B1.13, cmt. n.1(D).

### C.   Lack of Extraordinary and Compelling Reasons

In the present case, the defendant's request for a sentence reduction should be denied because he has not demonstrated "extraordinary and compelling reasons" warranting release.   As explained above, under the relevant provision of Section 3582(c), a court can grant a sentence reduction *only* if it determines that "extraordinary and compelling reasons" justify the reduction and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission."   18 U.S.C. § 3582(c)(1)(A)(i).   The Sentencing Commission's policy statement defines "extraordinary and compelling reasons" to include, as relevant here, certain specified categories of medical conditions. U.S.S.G. § 1B1.13, cmt. n.1(A).

For that reason, to state a cognizable basis for a sentence reduction based on a medical condition, the defendant first must establish that his condition(s)

fall(s) within one of the categories listed in the policy statement.   Those

categories include, as particularly relevant here, (i) any terminal illness, and (ii)

any "serious physical or medical condition . . . that substantially diminishes the

ability of the defendant to provide self-care within the environment of a

correctional facility and from which he or she is not expected to recover."

U.S.S.G. 1B1.13, cmt. n.1(A).   If a defendant's medical condition does not fall

within one of the categories specified in the application note (and no other part

of the application note applies), his motion must be denied.   The defendant fails

to meet the established criteria.

The mere existence of the COVID-19 pandemic, which poses a general

threat to every non-immune person in the country, does not fall into either of

those categories and therefore could not alone provide a basis for a sentence

reduction.   The categories encompass specific serious medical conditions

afflicting an individual inmate, *not* generalized threats to the entire population.

As the Third Circuit has held, "the mere existence of COVID-19 in society and

the possibility that it may spread to a particular prison alone cannot

independently justify compassionate release." *United States v. Raia*, 954 F.3d 594,

597 (3d Cir. 2020); *see also United States v. Eberhart*, No. 13-cr-00313-PJH-1,

2020 WL 1450745 at *2 (N.D. Cal. Mar. 25, 2020) (Slip Op.) ("a reduction of

sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").[3]  To classify COVID-19 as an extraordinary and compelling reason would not only be inconsistent with the text of the statute and the policy statement, but would be detrimental to BOP's organized and comprehensive anti-COVID-19 regimens, could result in the scattershot treatment of inmates, and would undercut the strict criteria BOP employs to determine individual inmates' eligibility for sentence reductions and home confinement.  Section 3582(c)(1)(A) contemplates sentence reductions for specific individuals, not the widespread prophylactic release of inmates and the modification of lawfully imposed sentences to deal with a world-wide viral pandemic.

That does not mean, however, that COVID-19 is irrelevant to a court's

---

[3]  *See also, e.g.*, *United States v. Coles*, 2020 WL 1899562 (E.D. Mich. Apr. 17, 2020) (denied for 28-year-old inmate at institution with outbreak); *United States v. Okpala*, 2020 WL 1864889 (E.D.N.Y. Apr. 14, 2020); *United States v. Weeks*, 2020 WL 1862634 (S.D.N.Y. Apr. 14, 2020); *United States v. Haney*, 2020 WL 1821988 (S.D.N.Y. Apr. 13, 2020) (denied for 61-year-old with no other conditions); *United States v. Pinto-Thomaz*, 2020 WL 1845875 (S.D.N.Y. Apr. 13, 2020) (two insider trading defendants with less than a year to serve have no risk factors); *United States v. Korn*, 2020 WL 1808213, at *6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Carver*, 2020 WL 1892340 (E.D. Wash. Apr. 8, 2020).

analysis of a motion under § 3582(c)(1)(A).   If an inmate has a chronic medical condition that has been identified by the CDC as elevating the inmate's risk of becoming seriously ill from COVID-19,[4] that condition may satisfy the standard of "extraordinary and compelling reasons." Under these circumstances, a chronic condition (*i.e.*, one "from which [the defendant] is not expected to recover") reasonably may be found to be "serious" and to "substantially diminish[] the ability of the defendant to provide self-care within the environment of a correctional facility," even if that condition would not have constituted an "extraordinary and compelling reason" absent the risk of COVID-19.   U.S.S.G. § 1B1.13, cmt. n.1(A)(ii)(I).

But as part of its analysis of the totality of circumstances, the Court should consider whether the inmate is more likely to contract COVID-19 if he is released than if he remains incarcerated.   That will typically depend on the inmate's proposed release plans and whether a known outbreak has occurred at his institution.   As of the date of this response, Forrest City Low, FCI reports 259 inmates testing positive for COVID-19, 1 staff member testing positive, zero

---

[4] *See* Centers for Disease Control, *At Risk for Severe Illness*, *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last modified Apr. 2, 2020).

deaths, 48 inmate recoveries, and 2 staff recoveries.   The defendant has presented this Court with no proposed release plan.

Here, the defendant states that "[a]s a long-time sufferer from hypertension, [he] is uniquely susceptible to severe complications from COVID-19, should he contract this highly contagious disease.  He faces a substantial risk of death."   (Doc. 57, Mot. for Compassionate Release at 7.)

In this instance, the defendant has fallen short of identifying a medical condition that falls within one of the categories specified in the policy statement's application note.   Defendant's asserted condition does not itself rise to the level of severity required under the policy statement.   Moreover, the defendant's alleged compromised condition (hypertension) is not a condition identified by the CDC as increasing a person's risk for developing serious illness from COVID-19.   *See* note 4.[5]

---

[5] The following is provided by the CDC in response to the question of whether patients with Hypertension are at a higher risk from COVID-19:

> Although many patients with severe illness from COVID-19 have underlying hypertension, it is unclear at this time if hypertension is an independent risk factor for severe illness from COVID-19. Hypertension is common in the United States. Hypertension is more frequent with advancing age and among men, non-Hispanic blacks, and people with other underlying medical conditions such as obesity, diabetes, and serious heart disease. **At this time, people whose only underlying medical condition is hypertension *are not* considered to be at higher risk for severe illness from COVID-19**. (Emphasis Supplied).

For these reasons, the defendant has failed to establish an "extraordinary and compelling reason" for emergency release under Section 3582(c)(1)(A)(i). The motion should therefore be denied.

III.   <u>CONCLUSION</u>

The defendant has failed to demonstrate extraordinary and compelling reasons for this Court to grant the requested relief in this instance.   Thus, the government respectfully moves this Court to overrule his motion.

Respectfully submitted,

STEPHEN R. McALLISTER
United States Attorney
District of Kansas

By:   /s/  *Jared S. Maag*

JARED S. MAAG, KS Bar No. 17222
Assistant United States Attorney
District of Kansas
290 Carlson Federal Building
444 SE Quincy Street
Topeka, KS 66683
Ph: 785.295.2850 (Office)
Fax: 785.295.2853
jared.maag@usdoj.gov

16

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of May, 2020, I electronically filed the foregoing Response with the Clerk of the Court by using the CM/ECF system which will send a copy of the same to all counsel who have entered their appearance in this matter, to include the following counsel:

John R. Humphrey, MO Bar NO. 34178
KS FED DIST CT Bar NO. 78413
Attorney for Defendant Steven Lavy
121 West 63rd Street, Suite 201
Kansas City, Missouri 64113
jhumphrey79@hotmail.com
PHN 816-333-2000
FAX 816-817-0880

Gabriel L. Pardo (Cal. Bar No. 261625)
Attorney for Defendant Steven Lavy
Admitted Pro Hac Vice
gpardo@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5164
Facsimile: (213) 232-5167


By:     /s/  *Jared S. Maag*

JARED S. MAAG, Ks. Bar. No. 17222
Assistant United States Attorney

17